Filed 2/27/13  P. v. Silva CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B236916 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA072796) |
| v. | |
| RAUL SILVA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Susan Pochter Stone, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

A jury found appellant Raul Silva guilty of first degree murder (Pen. Code, § 187, subd. (a)),[1] and found true three special circumstance allegations -- witness murder, lying-in-wait, and gang murder (§ 190.2, subds. (a)(10), (a)(15), & (a)(22)) -- as well as a gang enhancement allegation (§ 186.22, subd. (b)(1)(C)). The trial court sentenced appellant to state prison for life without the possibility of parole. He appeals from the judgment of conviction, contending that his conviction must be reversed because the evidence was insufficient to corroborate the testimony of an accomplice, Jose Covarrubias. We affirm the judgment.

## BACKGROUND

*Prosecution Evidence*

Appellant, a 204th Street gang member, was convicted as an aider and abettor in the murder of Christopher Ash. Ash was a 204th Street gang member who was killed because fellow gang members believed he was a "snitch" regarding the murder of 14-year-old Cheryl Green, committed by 204th Street gang member Jonathan Fajardo. According to Jose Covarrubias, an accomplice in Ash's killing and the key prosecution witness at trial (as well as the boyfriend of Ash's sister), Ash was murdered in the garage of appellant's house. Like Covarrubias, the participants in the murder were all 204th Street gang members, including appellant, Fajardo, Robert Gonzales, and Carlos Pimentel. Because the only issue on appeal is the sufficiency of the evidence to corroborate Covarrubias' testimony, our summary of the evidence focuses primarily on his testimony. We save for our Discussion section a description of much of the corroborating evidence.

---

[1]     All further statutory references are to the Penal Code.

2

The Green murder about which Ash was purportedly informing occurred on December 15, 2006. Members of the 204th Street gang, including Ash, were later questioned by Los Angeles Police Officers about the shooting. The police ultimately determined that Fajardo, a 204th Street gang member, shot Green, with Ernesto Alcarez, another 204th Street gang member, acting as his lookout.

On December 21, 2006, Los Angeles Police Officers investigating Green's murder executed search warrants at eight homes believed to belong to 204th Street gang members, including Ash's apartment on 204th Street. In the apartment, police discovered a hand grenade and ammunition. Alcarez, Ash, Covarrubias, and Daniel Aguilar (a long-time friend of Ash and a fellow 204th Street gang member), who were present during the search, were taken in for questioning and released.

Thereafter, according to Covarrubias, rumors started that Ash was snitching about the Green murder. Also, Aguilar claimed that Ash kept journals about the gang. On December 28, 2006, Covarrubias was walking down the street when appellant drove up in his Bronco and asked him to get in the car. Aguilar and another 204th Street gang member, Eugenio Claudio, were also in the car. Appellant drove to Claudio's house. where he asked Covarrubias about the December 21 raid. Covarrubias told him that he and Ash were handcuffed when they returned from getting drugs and that the police found ammunition in Ash's house.

After saying that they were going to "put in work" for the gang, appellant drove Covarrubias, Claudio, and Aguilar to appellant's house, where they went into the garage. Several other 204th Street gang members joined them, including Fajardo, Carlos Pimentel, and Robert Gonzales.

Pimentel pulled Covarrubias aside and asked if he thought Ash was snitching. Covarrubias said yes, because no one was arrested even though

3

ammunition, a gun, and a grenade were found at Ash's house during the raid. He also told Pimentel that Aguilar said Ash had a diary of gang activities.

Pimentel said that Ash was going to be killed. He told Covarrubias to follow his lead when Ash arrived and "tear up" Ash's body. Everyone present, including appellant, listened and agreed that Ash should be killed for being a snitch. Gonzales passed out knives to some of the group. Fajardo armed himself with a shotgun, and appellant had a revolver.

At Pimentel's direction, Aguilar and Gonzales left to pick Ash up. According to Ash's mother, Karen Blish, around 10:38 that night, Ash woke her up and told her that he and Aguilar were going next door. Aguilar hugged Karen and told her everything was going to be okay. Ash and Aguilar left.

Meanwhile, according to Covarrubias, while the group at appellant's garage was waiting for Aguilar to return with Ash, appellant received a call from Aguilar to say they were on their way. When Ash entered the garage, Fajardo hit him in the back of the head with his shotgun. The others, including appellant, began hitting and kicking Ash and calling him a snitch, a charge Ash denied. Pimentel told everyone to leave Ash alone. He put his arms around Ash, and then stabbed him in the neck repeatedly. Covarrubias and the others stabbed Ash as well.[2] Covarrubias became sick at the stabbing, and dropped his knife.

After Ash was dead, the body was wrapped in a blanket. Pimentel left to get a van that belonged to his girlfriend, Adela Duarte. When he returned, the group put the body in the van, and Fajardo and Pimentel drove away in the van. Appellant, Covarrubias, Aguilar, and others cleaned the garage, washing the blood away and throwing paint and paint thinner on the garage floor.

---

[2]     In a pretrial statement to detectives, Covarrubias said that he, Pimentel, and Gonzales were the three who stabbed Ash. Appellant and the others struck him.

Fajardo returned from disposing of the body, took Covarrubias aside, and told him to toughen up and not let the others see him crying. Fajardo told Covarrubias that the others had planned to kill Ash, Aguilar, and Covarrubias because they thought they all were snitching, but Fajardo spoke up for Covarrubias and Claudio spoke up for Aguilar. No one had spoken up for Ash.

Ash's body was found that night around 11:30 p.m. on Grace Avenue in the City of Carson, wrapped in a blanket with multiple stab wounds and five blunt force injuries to his head.

Pimentel's girlfriend, Duarte, testified that on December 28, 2006, she and Pimentel went out in her van and returned around 10:00 p.m., parking the van in its usual space. The keys were left in the usual place in the living room. Duarte went to bed shortly after coming home. The following morning, Duarte's neighbors showed her that her van had hit one of her neighbor's cars. The van was not parked where Duarte and Pimentel had left it the night before, but was parked backwards, facing head out. Duarte noticed that appellant's Bronco was also in the parking area, blocking her neighbor's car.

Investigators later discovered blood in the van that was determined to be Ash's. They also discovered traces of Ash's blood in appellant's garage.

**DISCUSSION**

Appellant contends that the evidence was insufficient to corroborate Covarrubias' testimony linking appellant to Ash's killing, and that therefore the judgment must be reversed. We disagree.

Section 1111 prohibits a defendant from being convicted on the uncorroborated testimony of an accomplice. However, the requisite corroboration of an accomplice's testimony "'may be circumstantial or slight and entitled to little

5

consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime. [Citation.] The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' [Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 505.)

Here, there was a wealth of evidence corroborating Covarrubias' testimony connecting appellant with Ash's murder. We mention only some of it, beginning with evidence we have already mentioned in our evidentiary summary. Ash's blood was discovered in appellant's garage (where Covarrubias said the killing occurred), as well as in Adela Duarte's van (which Covarrubias said was used to transport Ash's body away from appellant's garage). Moreover, Karen Blish's testimony that Ash left her house with Aguilar on the night of the murder corroborated Covarrubias's testimony that Aguilar had been dispatched from appellant's garage to bring Ash back there to be murdered.

Other evidence further corroborated appellant's involvement, most importantly jail house conversations between Fajardo and appellant in which they discussed Ash's murder. On January 8, 2007, appellant and Fajardo were housed together in a jail cell that was equipped with recording equipment. Portions were introduced at trial.

At one point, Fajardo told appellant, "they found the blood all over Adela's [Duarte's] van dawg. In the back." Appellant replied, "Don't talk too much. . . . That's why they put you in here, I think. . . . To see – to see if one talks about

6

something." Later, Fajardo told appellant, "they say they got my fingerprints on the steering wheel," but appellant reassured him, "They're gonna say all that shit."

Fajardo told appellant that he admitted to the police that he killed Ash. Appellant then asked if the police had asked about "the pad, my mom's pad," indicating appellant's concern that the police knew Ash had been killed in his garage.

Fajardo mentioned that the police took his clothing to look for evidence, and appellant replied, "Remember [w]hat then I had told you?" Fajardo said, "Clean that shit good homie. You said something like that." Appellant added, "Remember take that shit to the car wash." Fajardo replied, "I never did though."

Fajardo and appellant talked several times about whether someone was snitching. At one point, Fajardo told appellant, "I ain't say no names homie. . . . I put the blame to myself." Fajardo said that he heard that Ash "wasn't throwing rats." Appellant asked Fajardo, "Who might it been? Who do you think it was?" Fajardo said that he did not know, but they began speculating that it was "Cavey," or Eugenio Claudio. After more discussion, appellant reminded Fajardo, "Don't talk too much." Fajardo later said, "I'm already taking blame for everything. I'm already taking blame for [Green's murder]. I'm just trying to get Puppet [Alcarez] out," because "he had nothing to do with it." Fajardo also said that the detectives "took me to where we dumped that fool."

These conversations and appellant's participation in them corroborated Covarrubias' account of appellant's involvement in the murders. Together with the presence of Ash's blood in appellant's garage and Duarte's van, and Karen Blish's testimony corroborating Covarrubias' account of how Ash was transported to appellant's garage to be murdered, the jailhouse conversations constituted near irrefutable evidence corroborating appellant's involvement in Ash's killing. This

7

evidence was certainly sufficient to meet the standard required for accomplice corroboration.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


SUZUKAWA, J.